WILLIAM J. BURNETT
DAMIEN NICHOLAS TANCREDI
**FLASTER/GREENBERG P.C.**
1810 Chapel Avenue West
Cherry Hill, NJ 08002-4609
(215) 587-5675
*Proposed Counsel for Debtors in Possession.*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In Re:<br><br>CARPENTER REALTY CORPORATION<br><br>    Debtor. | Chapter:  11<br><br>Case No.: 21-18789 |
| In Re:<br><br>GLOUCESTER GROUP, INC.<br><br>    Debtor. | Chapter:  11<br><br>Case No.: 21-18793 |
| In Re:<br><br>BRIARDALE FARMS, INC.<br><br>    Debtor. | Chapter:  11<br><br>Case No.: 21-18792 |
| In Re:<br><br>CARPENTER WAREHOUSING, INC.<br><br>    Debtor. | Chapter:  11<br><br>Case No.: 21-18790 |
| In Re:<br><br>EQUITY RESOURCES, INC.<br><br>    Debtor. | Chapter:  11<br><br>Case No.: 21-18791 |

**DECLARATION OF MARK IMBESI IN SUPPORT OF**
**<u>FIRST DAY MOTIONS AND APPLICATIONS</u>**

I, Mark Imbesi, being duly sworn, state the following under penalty of perjury:

1.     I am the President and Director of each of the above-captioned entities (collectively, the "Debtors").  As such, I oversee all aspects of the business of Debtors.  I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify I would testify competently to the facts set forth herein.

2.     I am generally familiar with the Debtors day-to-day operations, business and financial affairs, and books and records.

3.     Except as otherwise indicated herein, all statements set forth in this declaration (this "Declaration") are based upon (a) my personal knowledge of and familiarity with the Debtors' operations, finances and restructuring efforts, (b) my review of relevant documents and information provided to me by employees of or professional advisors to the Debtors, and/or (c) my opinion based on my experience and knowledge concerning the Debtors' operations and financial and business affairs, including my general knowledge of the industry in which the Debtors operate.

4.     On the date hereof (the "Petition Date"), the Debtors filed these Chapter 11 cases (the "Chapter 11 Cases") under Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (the "Court").

5.     The Debtors are requesting various forms of relief under to certain "First Day" motions and applications (collectively, the "First Day Pleadings") filed concurrently with this Declaration.

6.     I submit this Declaration in support of the First Day Pleadings to provide an overview of the Debtors and their businesses. I am familiar with the contents of each of the First Day Pleadings, including the exhibits and schedules attached thereto. I believe that the relief

2

requested in each First Day Pleading: (a) is necessary to preserve and maximize the value of the

Debtors' estate; (b) is essential to the success of these Chapter 11 Cases; and (c) serves the best

interests of the Debtors' estate, the Debtors' creditors, and other parties in interest.

7.    The relief requested in the First Day Pleadings are intended to minimize the

potential adverse effects of the commencement of these Chapter 11 Cases on the Debtors' on-

going business operations and also to enable the Debtors to implement their strategy for success

in this case.

8.    This Declaration provides a brief description of the Debtors' current

organizational structure and operations, its current financial condition and the events leading to

this Chapter 11 Case as well as the facts which are most relevant to this Court's consideration of

the First Day Pleadings, and is intended to supplement any other declarations submitted in direct

support of any given motion or application.

### Background of Debtors and Events Leading to Commencement of Chapter 11 Case

9.    Generally, the Debtors are owners, landlords and managers of valuable real

property and buildings consisting of industrial lands, farms, commercial buildings, residences,

wetlands and other real estate.  The various parcels of land have had significant and historical

uses and development over time.  The Debtors also perform various storage, warehousing and

logistics services as well as assembling fence panels for certain customers.    Carpenter

Warehousing also does antique auto restorations, for customers in one of its buildings

(Approximately 11,000 square feet).

### Capital Structure

10.    The Corporate Structure is as follows: **Gloucester Group, Inc. ("Gloucester")**, a

New Jersey Corporation, is 99.98% own by me and .02% by my brother, John Imbesi.

Gloucester Group, Inc., in turn, is the parent and is the 100% owner of **Carpenter Realty**

3

Corporation (**"Carpenter Realty"**), a Delaware Corporation. **Equity Resources, Inc. ("Equity")**, a New Jersey Corporation, is 100% owned by me. **Carpenter Warehousing, Inc. ("Warehousing")**, a New Jersey Corporation is also 100% owned by me. **Briardale Farm, Inc. ("Briardale")**, a New Jersey Corporation is owned 25% by me; 12.5% by my wife, Marianne Imbesi, 12.5% by my son, Anthony M. Imbesi, 12.5% by my daughter, Alexandria Imbesi McEnHill, and 12.5% by my other daughter, Victoria Imbesi McGuire. The remaining 25% owners of Briardale Farm, Inc. are held 12.5% each by my nephews, Anthony L. Imbesi and Joseph N. Imbesi (along with Lawrence Imbesi, Patricia Imbesi and Antonia Imbesi Rotelle, collectively the "Plaintiffs"), who are Plaintiffs in two cases pending in Superior Court of New Jersey (collectively, the "NJ State Court Litigation") described below.

11.    It should be noted that Carpenter Realty, Inc. wholly owns a subsidiary, Andora Ridge Company (f/k/a 7up Bottling Co of Philadelphia) ("Andora"). Andora is *not* a Debtor. Andorra is not a party to the NJ State Court Litigation and owns no assets.

12.    I am the President and a Director of each Debtor entity, and I have been authorized and appointed to file these Chapter 11 cases on their behalf and take all necessary actions in these cases, including but not limited to the sale of the properties as appropriate and only upon motion and approval of this Court.

[Intentionally Left Blank]

## **Property Ownership**

13. The properties and general descriptions and approximate value are listed below for general information and reference purposes only (none of the values are intended to be binding or to be deemed either a valuation or admission of any kind):

| Owner | Property Details | Estimated Value |
|---|---|---|
| Carpenter Realty | 1 Glass Street, Bridgeton NJ 08302<br><br>older industrial site consisting of (230,000± sq ft)7 building and building complexes dating back to the 1880s. Block 128 Lot 1, Block 124 Lots 4 &6, Block 126 Lots 9 &10. | ≥ ~$4,250,000, subject to higher and better offers |
| Carpenter Realty | Heritage Bank HeadQuarters built in 1984, (38,000±sq ft) Block 56 Lot30.1 in Monroe Township NJ right by exit 8A of the NJ turnpike | ≥ ~$5,500,00, subject to higher and better offers |
| Carpenter Realty | 14.5 acres in Estell Manor NJ of wooded and wetland Lot 1 Block 1 | Unallocated portion of package sale worth ≥ ~$16,000,000, subject to higher and better offers |
| Carpenter Realty | 15 Lakeside Drive, Bridgeton NJ 08302<br><br>Purchased in July 2018 for $58,000.00. Current lease purchase 10 year @728.40/month | Unknown |
| Briardale | Farm in Maurice River Township, Cumberland County NJ<br><br>2150± acre farm Cumberland County NJ. Block 117 Lot 4 and 4.01 and Block 118 Lots 3 & 7.  Briardale was developed as a Thoroughbred breeding farm in the 1950s and 60s and continued full force until 1981 and to a much lesser degree until 2005. The Property is in the Pinelands Protection Zone and has about 750+/- acres of wetlands and an additional 400 +/- acres in wetlands buffer area.  Better than 500 acres are not cleared wooded uplands. | Unallocated portion of package sale worth ≥ ~$16,000,000, subject to higher and better offers |
| Equity | Maurice River Township Cumberland County NJ<br>150 acres (Block 117 Lot 4.02) and a 1994 Built House of 13,000 total sq ft although only 6500 is truly finished.  The property also has an impressive arena 20,000 sq ft and 8 stall horse barn<br>The property is surrounded on 3 sides by Briardale Farm property and has road frontage directly across from my property | Unallocated portion of package sale worth ≥ ~$16,000,000, subject to higher and better offers |

14.    Notably, the Debtors do not have any third-party lenders or banks with a secured

interest in property or cash collateral.    Nevertheless, it should be noted that Antonia Imbesi

Rotelle has a mortgage in the current face amount of approximately $670,000 on the property

owned by Equity Although there are various *lis pendens* related to the NJ State Court Litigation

and tax sale certificates filed against the above properties, the properties are otherwise essentially

unencumbered and upon sale will generate substantial equity.

### Plaintiffs Thwart Payment of Briardale's Maintenance Costs

15.    The primary asset of Briardale is an approximately 2,100 acre tract of land in

Maurice River Township that has been owned by the Imbesi family in various forms since the

1950s. The land is located in a New Jersey Pinelands Forest Management Area and features a

roughly comparable proportion of wetlands, forested land, and cleared land. The property also

contains several barns and a primary residence that has been vacant for a substantial number of

years. In addition to the property owned by Briardale, three contiguous lots are owned by a

portion of the other Debtors. Two of those lots lay in the center of the Briardale tracts.

16.    Since 1981, Briardale has generated only minimal revenues.

17.    Briardale property - land, buildings and farm - cost significantly more to maintain

(taxes, fuel, utilities, repairs, supplies, wages, etc.) than Briardale generates.    For the past 16 plus

years, Carpenter Realty and Warehousing have funded such costs, creating intercompany

receivables due from Briardale to Carpenter Realty and Warehousing.

18.    It is clear that, absent a sale of Briardale's properties, Briardale has no means to

repay this liability.    To further complicate matters, as indicated in the property ownership chart

above, a potential sale of the Briardale property is best packaged with other properties owned by

other Debtors.  As described in more detail below, the Plaintiffs have unreasonably thwarted any opportunity to sell these properties.

19.    As President and Director, of Carpenter Realty and Warehousing, I am unwilling to continue to fund the continuing maintenance costs of the Briardale property without a clear avenue for recovery, which I believe can only be accomplished through bankruptcy.

20.    As President and Director of Briardale, I know that bankruptcy cases will provide the best and most efficient avenue for recovery.  These Chapter 11 cases will provide a platform to obtain the highest and best value for the Briardale property while enabling the best forum to allocate the proceeds to the values of the properties and reconcile and pay the intercompany debt.

### Bankruptcy Will Enable Resolution with PBGC

21.    The Debtors have significant issues with the Pension Benefit Guaranty Corporation (the "PBGC") which is generally summarized as follows.

22.    7-Up Bottling Company of Philadelphia, Inc. is a Pennsylvania corporation, as well as the sponsor and plan administrator of the 7-Up Bottling Company of Philadelphia, Inc. Pension Plan (the "Pension Plan").  Carpenter and Gloucester are members of 7-Up's controlled group (as defined in 29 U.S.C. § 1301(a)(14)).  PBGC expressed its concerns to 7-Up regarding 7-Up's ability to pay benefits when due and protect the interests of participants and asserted that PBGC's possible long run loss with respect to the Pension Plan could increase unreasonably.

23.    As a result, on February 27, 2017, PBGC issued a Notice of Determination (the "NOD") determining (1) that under 29 U.S.C. § 1342(a)(2) and (4) the Pension Plan would be unable to pay benefits when due and that the possible long-run loss of PBGC may reasonably be expected to increase unreasonably if the Plan was not terminated, (2) establishing February 28,

7

2017, as the Pension Plan's termination date under 29 U.S.C. § 1348 (the "DOPT"), and (3) appointing PBGC as statutory trustee of the Pension Plan.

24.    Subsequently, after substantial negotiations, the PBGC agreed to withdraw the NOD in conjunction with the parties agreeing to negotiate how the Pension Plan would operate going forward and achieve a "standard termination."[1]

25.    The parties were in the final phase of their years-long negotiations to resolve all issues and achieve the primary objective of all parties: effectuate a "standard termination" of the Pension Plan and enable the Pension Plan beneficiaries to be paid their retirement benefits.

26.    In order to implement this proposed resolution, the parties have agreed to use the proceeds of the net sale of the Bridgeton property owned by Carpenter Realty to fund a standard termination.

27.    As described in more detail below, on the cusp of global settlement, the Plaintiffs have unreasonably thwarted any opportunity to sell this property and essentially chilled the PBGC deal.  This action has seriously threatened the viability of a PBGC settlement which, in turn, has imperiled rights of the beneficiaries of the pension plan and subjected all of the parties to continued serious risk and future exposure to the PBGC as well as potentially the DOL.

28.    During this Chapter 11 process, Carpenter Realty will now be able to sell the Bridgeton property and move forward with the resolution with the PBGC.  As a result, the parties will be able to memorialize and consummate the settlement with the PBGC, subject to approval of this Court.

---

[1] The Department of Labor ("DOL") has also raised various issues relating to the Pension Plan. Rather than continue to pursue parallel investigations, the DOL agreed to reserve their rights by defer to the PBGC to address in their negotiations. Notably, in the event that the PBGC is unable to come to a global resolution, the DOL may reopen their investigation

**NJ State Court Litigation**

29.   On December 17, 2020, Joseph Imbesi and Anthony L. Imbesi filed a Complaint against me personally, my wife and each of the Debtors (other than Warehouse).  The Complaint references a third-party purchaser proposed an option-purchase agreement for Briardale's land and additional lots of land owned separately by other entities for the aggregate purchase price of $15,900,000.  The portion of that purchase price allocated to land owned by Briardale is $7,155,000. At its heart, the Complaint alleges that this allocation of the total purchase price for Briardale's real property is inequitable. Plaintiffs also complain that they have not yet been provided with all of the documents and records they have requested.

30.   This potential purchaser exercised its right to terminate this transaction and is no longer actionable at least in part because of the Plaintiffs actions. As a result, this 2020 Complaint is essentially moot at this time.

31.   On or about January 7, 2021, Lawrence Imbesi, Patricia Imbesi and Antonia Imbesi Rotelle filed a complaint (thereafter amended) which essentially alleged that I underpaid them for shares of the Debtors' equity that I purchased from them in December of 2017 and January of 2020. This complaint essentially seeks a constructive trust over any property sales as well as damages and recession and an accounting.

32.   Both Complaints are pending in the Superior Court of New Jersey, Chancery Division/Cumberland County.  The 2021 Complaint is docketed under case number CUM-C-1-21.

33.   On August 13, 2021, the state court entered an Order Imposing Temporary Restraints which, *inter alia*, enjoining and restraining the Debtors from selling or transferring or entering into any sale agreement for any real property of the Debtors without written consent of

the Plaintiffs or order of the state court, and requiring that the Defendants keep the Plaintiffs informed of any proposals for such sales (the "August 13, 2021 Order").

34.   Despite the arguments of the Debtors to the contrary, on October 29, 2021, the state court found that the Debtors violated the August 13, 2021 Order regarding the Agreement of Sale of Carpenter Realty dated June 14, 2021 for the sale of property located at 117 Fitchville Road, Bozrah, Connecticut and ordered the "defendant"[2] to replenish and transfer full the proceeds of that sale and deposit the funds in the attorney trust account of the counsel to the Plaintiffs.

35.   The defendant cannot comply with the October 29, 2021 Order as the proceeds have been used to pay third-party creditors, taxing authorities, and employees.

36.   Other than ordinary salary wages, neither I nor my family have received any proceeds of the Connecticut property sale.

37.   I strongly believe that the best way to comply with spirit of the state court orders while providing a forum for all parties to have their grievances heard and rights asserted (regarding price allocation, valuation, intercompany loans and other matters) is through a bankruptcy process which will enable an efficient and transparent Section 363 sales process of all of the Debtors' property to the highest and best bidder where the sales proceeds will only be distributed in accordance with Orders of this Court.

38.   This Chapter 11 bankruptcy process will provide an efficient sales mechanism with significantly more oversight, notice, disclosure and structure for the sales of the Debtors' properties than as contemplated by the August 13, 2021 Order in the NJ State Court Litigation.

39.   A Chapter 11 sale process mandates full marketing process and notice as well as a judicial finding that any sale must be consistent with the Debtors' fiduciary duties to achieve the

---

[2] The October 29th Order is unclear regarding which defendant(s) are actually bound by it.

highest and best consideration for each asset sold. The purchase prices could be further enhanced in a Chapter 11, because rather than cloudy title, all buyers will receive an Order from this Court insuring that the property is free and clear of liens, claims and encumbrances. Further, any disputes regarding the disposition of the proceeds can and should be addressed later without imperiling any potential buyers.

<u>**Plaintiffs are Blocking Another Potentially Viable Sale**</u>

40.   On or about November 5, 2021, the Debtors received a bid for $16,000,000 for the same property sought to be purchased in the option transition referenced above.

41.   Consistent with the August 13, 2021 Order, the Debtors forwarded the letter of intent for this transaction to the Plaintiffs.

42.   On November 11, 2021, the Plaintiffs refused to consent to sale.  Rather, they opted to conduct a discovery mission and risk losing this buyer while complaining about allocation issues that do not need to be addressed before a sale is consummated.  They further asserted, without proof or alternatives, that the offer was too low.

43.   Rather than engage in a lengthy and piecemeal litigation battle while buyers may become discouraged and sales opportunities may pass, I strongly believe that it is in the best interest of all of the Debtors to engage in an open-market 363 sale process.

44.   Disputes about the potential proceeds of a sale ought not to thwart the initial monetization process of which Bankruptcy is best suited to achieve.

<u>**Bankruptcy Is the Best Alternative**</u>

45.   For the foregoing reasons, I believe that the best alternative for the Debtors is to facilitate fair and open sales of it properties in a Chapter 11 process.

<u>**Facts Supporting the First Day Pleadings**</u>

46.    Shortly after the filing of their Chapter 11 petitions, the Debtors will be filing the First Day Pleadings including the Joint Administration Motion, the Wage Motion, the Utilities Motion, the Insurance Motion, the Schedules and Petition Document Extension Motion, and the Professional Retention Applications.    The relief requested in each of the First Day Pleadings constitutes a critical element in preserving the value of the Debtors' estates for the benefit of all parties in interest.

47.  For the reasons stated herein and in each of the First Day Pleadings filed concurrently or in connection with the commencement of this Bankruptcy Case, it is my view that granting the relief requested in the Pleadings is vital to the operations of the Debtors and the success of these Chapter 11 Cases.

I hereby affirm under penalty of perjury that the matters set forth herein are true and correct to the best of my knowledge, information and belief.

Dated November 12, 2021

_____
**Mark Imbesi**